**Slip Op. 03-143**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: RICHARD W. GOLDBERG, SENIOR JUDGE**

|  |  |
|---|---|
| BETHLEHEM STEEL CORPORATION, ISPAT INLAND INC., LTV STEEL COMPANY, INC., UNITED STATES STEEL, LLC, and NATIONAL STEEL CORPORATION,<br><br>               Plaintiffs,<br><br>    v.<br><br>UNITED STATES,<br><br>               Defendant,<br><br>    and<br><br>USINAS SIDERURGICAS DE MINAS GERAIS S/A, COMPANHIA SIDERURGICA PAULISTA, COMPANHIA SIDERURGICA NACIONAL, THAI COLD ROLLED STEEL SHEET PUBLIC COMPANY LIMITED, ISCOR, LTD., NIPPON STEEL CORPORATION, NKK CORPORATION, KAWASAKI STEEL CORPORATION, SUMITOMO METAL INDUSTRIES, LTD., KOBE STEEL, LTD., NISSHIN STEEL COMPANY, LTD., EREGLI DEMIR VE CELIK FAB. T.A.S., and SHANGHAI BAOSTEEL GROUP CORPORATION,<br><br>               Defendant-<br>               Intervenors. | Cons. Ct. No. 00-00151 |

[Remanded to the ITC to redefine "internal transfers," clarify how it applied facts otherwise available, and reconsider whether the domestic industry has suffered material injury.]

Date: October 28, 2003

Dewey Ballantine, LLP (<u>Alan Wm. Wolff</u>, <u>Michael Henry Stein</u>, <u>Kevin M. Dempsey</u>, and <u>Andrew J. Conrad</u>) representing Plaintiffs

Bethlehem Steel Corporation, United States Steel, LLC, and National Steel Corporation.

Lyn M. Schlitt, General Counsel, James Lyons, Deputy General Counsel, U.S. International Trade Commission (Mary Jones), representing Defendant United States.

Willkie Farr & Gallagher, LLP (William H. Baringer) representing Defendant-Intervenors Thai Cold Rolled Steel Sheet Public Company Limited, Usinas Siderurgicas de Minas Gerais S/A, Companhia Siderurgica Paulista, and Companhia Siderurgica Nacional.

O'Melveny & Myers, LLP (Kristin Heim Mowry) representing Defendant-Intervenor Iscor, Ltd.

Willkie Farr & Gallagher, LLP (Matthew Robert Nicely, James P. Durling, and Jocelyn C. Flynn) representing Defendant-Intervenors Nippon Steel Corporation, NKK Corporation, Kawasaki Steel Corporation, Sumitomo Metal Industries, Ltd., Kobe Steel, Ltd., and Nisshin Steel Company, Ltd.

Law Offices of David L. Simon (David L. Simon) representing Defendant-Intervenor Eregli Demir ve Celik Fab. T.A.S.

Dorsey & Whitney, LLP (Philippe M. Bruno) representing Defendant-Intervenor Shanghai Baosteel Group Corporation.

## OPINION

**GOLDBERG, Senior Judge:** This case concerns the final negative injury determinations of the International Trade Commission ("ITC") in several antidumping ("AD") and countervailing duty ("CVD") proceedings involving cold-rolled steel ("CRS") products from Argentina, Brazil, China, Indonesia, Japan, Russia, Slovakia, South Africa, Taiwan, Thailand, Turkey, and Venezuela (collectively, the "Final Determinations").

The Plaintiffs are a group of domestic steel producers: Bethlehem Steel Corporation; Ispat Inland Inc.; LTV Steel Company, Inc.; United States Steel, LLC; and National Steel Corporation.  Neither Ispat nor National Steel are plaintiffs with respect to the investigation involving Japan.

The Defendant is the ITC.  The Defendant-Intervenors are a group of foreign steel producers: Usinas Siderurgicas de Minas Gerais S/A; Companhia Siderurgica Paulista; Companhia Siderurgica Nacional; Thai Cold Rolled Steel Sheet Public Company Limited; Iscor, Ltd.; Nippon Steel Corporation; NKK Corporation; Kawasaki Steel Corporation; Sumitomo Metal Industries, Ltd.; Kobe Steel, Ltd.; Nisshin Steel Company, Ltd.; Eregli Demir ve Celik Fab. T.A.S.; and Shanghai Baosteel Group Corporation.

## I.  BACKGROUND

On June 2, 1999, certain domestic producers of CRS products, including the Plaintiffs, filed AD and CVD petitions with the Department of Commerce and the ITC.  On July 30, 1999, the ITC published its preliminary determination.  The ITC determined that there was a reasonable indication that the domestic industry was injured, or threatened with material injury, by CRS imports sold at less than fair value from Argentina, Brazil, China, Indonesia, Japan, Russia, Slovakia, South Africa, Taiwan, Thailand, Turkey, and Venezuela, as well as by subsidized imports from Brazil.  The

ITC terminated the CVD investigations with respect to Indonesia, Thailand, and Venezuela.

On December 1, 1999, the ITC began the final phase of its investigations. On January 20, 2000, the ITC held a public hearing. The parties filed pre- and post-hearing briefs shortly before and after this hearing. On February 18, 2000, the ITC filed its Final Staff Report. One week later, on February 25, 2000, the ITC made available to the parties all information on which they had not yet had an opportunity to comment, and allowed the parties until February 29, 2000, to submit final comments on this information.

On March 14, 2000, the ITC found by a 5-1 vote that the domestic industry was not materially injured, or threatened with material injury, by reason of allegedly subsidized CRS imports from Brazil, or by reason of allegedly dumped CRS imports from Argentina, Brazil, Japan, Russia, South Africa, or Thailand. See Certain Cold-Rolled Steel Products From Argentina, Brazil, Japan, Russia, South Africa, and Thailand, 65 Fed. Reg. 15,008, USITC Pub. 3283 (Mar. 20, 2000) ("March Determination"). Similar negative determinations were subsequently published on May 17, 2000 with respect to allegedly dumped CRS imports from Turkey and Venezuela, and on July 17, 2000 with respect to allegedly dumped CRS imports from China, Indonesia, Slovakia, and Taiwan. See

Certain Cold-Rolled Steel Products From Turkey and Venezuela, 65 Fed. Reg. 31,348 (May 17, 2000); Certain Cold-Rolled Steel Products From China, Indonesia, Slovakia, and Taiwan, 65 Fed. Reg. 44,076 (July 17, 2000). The analysis contained in the March Determination was adopted in both subsequent determinations.

After defining the domestic like product and the industry, and deciding to cumulate the imports from all of the subject countries, the ITC began the final phase of its antidumping and countervailing duty investigation. In the final phase, the ITC must determine whether the domestic industry is materially injured by reason of the subject imports. See 19 U.S.C. §§ 1671d(b), 1673d(b). To make this determination, the ITC must consider all relevant economic factors within the context "of the business cycle and conditions of competition" of the domestic industry. 19 U.S.C. § 1677(7)(C)(iii). In determining that there was no material injury to the domestic CRS industry, the ITC analyzed the conditions of competition. As part of that analysis, the ITC looked to whether the captive production provision applied. March Determination at 15-18. If the captive production provision was applicable, then the ITC would "focus primarily on the merchant market for the domestic like product" to determine "market share and the factors affecting financial performance." 19 U.S.C. § 1677(7)(C)(iv).

The ITC concluded that the threshold requirements of the captive production provision were met — namely, that "domestic producers internally transfer[red] a significant share of their domestic production for captive consumption and [sold] a significant share on the merchant market."  March Determination at 16.  The ITC also found that the first two prongs of the captive production provision were met.  Id.  However, the ITC concluded that the third prong (that "the production of the domestic like product sold in the merchant market is not generally used in the production of that downstream article") was not met.  Id.  Therefore, the ITC did not apply the captive production provision.  Id. at 18.  Nevertheless, the ITC decided to consider captive production as a condition of competition because there was a significant volume of captive production. Id.

This appeal followed.  The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c).

## II. STANDARD OF REVIEW

Under the applicable standard of review, the ITC's determinations must be upheld unless they are not supported by substantial evidence or otherwise not in accordance with law. The ITC's determinations are presumed to be correct; the burden is on the party challenging a determination to demonstrate

otherwise.  See 28 U.S.C. § 2639(a)(1); Trent Tube Div. v. United States, 14 CIT 780, 784 (1990).

### III. DISCUSSION

The Plaintiffs challenge three aspects of the ITC's investigation.  First, the Plaintiffs allege that the ITC improperly found that the captive production provision of 19 U.S.C. § 1677(7)(C)(iv) was inapplicable to the Final Determinations.  See Mem. Supp. Rule 56.2 Mot. of Bethlehem, Ispat, LTV, & U.S. Steel at 17-43.  Second, Plaintiffs argue that the ITC improperly relied on information upon which the parties were not given an opportunity to comment.  See id. at 44-48.  Third, Plaintiffs charge that the ITC's findings concerning certain conditions of competition, and the volume and price effects of CRS imports, were not supported by substantial evidence and otherwise in accordance with law.  See Mem. Supp. Mot. J. Agency R. Under Rule 56.2 of Bethlehem, LTV, National Steel, & U.S. Steel at 10-45.

### A.   Applicability of the Captive Production Provision

As a general rule, the ITC considers the domestic industry as a whole in determining whether subject imports have caused material injury.  See 19 U.S.C. § 1673d(b)(1)(A)(i) (2000).  However, there is a narrow exception to this rule, commonly called the "captive production" provision, which provides that if

certain conditions are met, the ITC must "focus primarily on the

merchant market for the domestic like product" when determining

market share and the economic factors impacting the affected

domestic industry.  See 19 U.S.C. § 1677(7)(C)(iv) (2000).  The

captive production statute reads in pertinent part as follows:

> (iv) Captive production
>
> If domestic producers internally transfer significant
> production of the domestic like product for the
> production of a downstream article and sell significant
> production of the domestic like product in the merchant
> market, and the [ITC] finds that-
>
>      . . . .
>
>      (III) the production of the domestic like product
> sold in the merchant market is not generally used in
> the production of that downstream article,
>
> then the [ITC], in determining market share and the
> [economic factors impacting the affected domestic
> industry], shall focus primarily on the merchant market
> for the domestic like product.

19 U.S.C. § 1677(7)(C)(iv).  Thus, the captive production

provision seeks to determine whether imports compete with U.S.

production of the domestic like product in all its forms as a

whole, or only with sales of the domestic like product in the

merchant market.

In the March Determination, the ITC concluded that the

threshold requirements of the captive production provision were

fulfilled, and the first two criteria were met.  March

Determination at 16.  However, the ITC answered in the negative to the third criterion.  Id.  The third criterion requires that "the production of the domestic like product sold in the merchant market is not generally used in the production of that downstream article[.]"  19 U.S.C. § 1677(7)(C)(iv)(III).  The Plaintiffs challenge the ITC's finding with respect to the third criterion.  Mem. Supp. Rule 56.2 Mot. of Bethlehem, Ispat, LTV, & U.S. Steel at 21.

In the context of this investigation, there is no dispute that domestic producers of CRS products (the "domestic like product") transferred to related-party joint ventures approximately sixty percent of their total production (i.e., "significant production") of CRS for further processing into galvanized/coated products (the "downstream articles"), particularly corrosion-resistant steel and tin-mill products.  Id. at 19.  The remaining forty percent of domestic production was sold into the merchant market to indisputably unrelated customers.  Id.  The threshold question is whether transfers to those related-party joint ventures qualify as "internal" transfers.  If they do not, then the ITC's interpretation of the statute will be upheld.  However, if the transfers to related-party joint ventures are internal transfers, then the factual question becomes whether, under sub-subparagraph (III),

CRS sold in the merchant market is not generally used to produce downstream articles.  If not, then the captive production provision does apply, and the ITC must focus its analysis primarily on the forty percent of domestic sales of CRS made to indisputably unrelated customers.

1.    **Whether Transfers to Related-Party Joint Ventures Are Internal Transfers as a Matter of Law**

The ITC found that transfers of CRS for further processing to related-party joint ventures are not internal transfers for purposes of 19 U.S.C. § 1677(7)(C)(iv).  March Determination at 17.  In reaching its determination, the ITC focused on the fact that the related-party joint ventures in question were independent corporate entities jointly owned with foreign steel corporations.  Id.  The ITC reasoned that the statute speaks of "internal transfers," not "transfers to related parties."  Id.  The ITC also looked to the Statement of Administrative Action ("SAA"), which defines captive production as that done by "the same producer."   Id.; see also URUGUAY ROUND AGREEMENTS ACT, STATEMENT OF ADMINISTRATIVE ACTION, H.R. DOC. NO. 103-316, at 852 (1994).  Given the separate corporate status of the joint ventures, the ITC found that in every instance the joint ventures and the domestic CRS producers were not the same producer.  March Determination at

17. Thus, transfers to them could not be internal transfers within the meaning of the captive production provision. Id.

To ascertain whether the ITC interpreted the captive production provision in accordance with law, the Court must first "determine whether Congress's purpose and intent on the question at issue is judicially ascertainable." Timex V.I., Inc. v. United States, 157 F.3d 879, 881 (Fed. Cir. 1998). In determining Congress's intent, the Court "looks at the plain language of the statute, legislative history, and the canons of statutory construction[.]" Dupont Teijin Films USA, LP v. United States, 27 CIT __, Slip Op. 03-79 at 7 (July 9, 2003). If the statute is vague or silent, then the Court will extend Chevron deference to the ITC's interpretation. Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-44 (1984). The "[C]ourt must defer to an agency's reasonable interpretation of a statute even if the [C]ourt might have preferred another." Koyo Seiko Co. v. United States, 36 F.3d 1565, 1570 (Fed. Cir. 1994).

Whether the third prong of the captive production provision is met depends upon the measure of products "sold in the merchant market," and the measure of products "internally transferred" for production of downstream articles. 19 U.S.C. § 1677(7)(C)(iv). Congress did not define "sold" or "internally transferred" in the

statute.  It is clear that Congress intended to allocate all transfers of CRS to either the "sold" category or the "internally transferred" category.  The captive production provision establishes a dichotomy between those situations where domestic producers "internally transfer significant production of the domestic like product for the production of a downstream article[,]" and those where they "sell significant production of the domestic like product in the merchant market[.]"  Id. Therefore, as the ITC also found, the two categories of transactions must encompass all CRS transfers.  To define "sold" and "internally transferred," the Court looks to the legislative history and other canons of statutory interpretation to ascertain Congress's intent.

The first term to define is "sold."  The statute does not define "sold" or "sale."  As in NSK Ltd. v. United States, 115 F.3d 965, 974 (Fed. Cir. 1997), the Court will then resort to the common meaning of the word "sold."  The ITC and Defendant-Intervenors argue that the Court should not rely on the common definition of "sold" because NSK is not applicable to this case. Def.-Intervenors' Opp'n at 15-16.  While the ITC is correct that NSK involved a different product, hot-rolled steel, and was issued prior to the enactment of the captive production provision, the principles of the case are relevant.  Under NSK,

because Congress did not define "sold" to mean something other than its common meaning, the Court will defer to the common and accepted meaning of sale.  See NSK, 115 F.3d at 974.  Therefore, in this context, for the CRS to be sold in the merchant market, the title to the CRS must be transferred, consideration must be paid for the CRS, and the transfer of title must be to an unrelated party.[1]  Id. at 975.

It is clear that Congress did not intend for transfers of CRS to joint ventures to be included within the parameters of "sold in the merchant market" if those transfers did not meet the three requirements of a sale.  It is undisputed that joint ventures are related parties.  The evidence presented by the Plaintiffs to the ITC shows that the CRS passed to the joint ventures was never sold to the joint ventures.  Further, the ITC found that the joint ventures were related parties, although they were not the "same producers."  March Determination at 17.  Therefore, the Court will give no deference to the ITC's definition of sold.

---

[1] The SAA's definition of merchant market sales further supports the common and accepted meaning of sale.  As the ITC noted in the March Determination, the SAA defines merchant market sales as "sales of the domestic like product to unrelated customers."  March Determination at 17; URUGUAY ROUND AGREEMENTS ACT, STATEMENT OF ADMINISTRATIVE ACTION, H.R. DOC. NO. 103-316, at 852 (1994).

The next stage of the inquiry is to determine whether the transfers to the joint ventures qualify as "internal transfers." The statute does not define internal transfers. There is no commonly understood meaning of internal transfers, and no party has provided one. Therefore, the Court will give deference to a reasonable interpretation by the ITC.

The ITC has defined internal transfer to mean a transfer between parts of the same corporation. March Determination at 17. Therefore, because the joint ventures have corporate structures separate from the domestic producers, they internally transfer significant production of the domestic like product for the production of a downstream article, and sell significant production of the domestic like product in the merchant market. If Congress had not clearly excluded the transactions to the related-party joint ventures from the sales category, this would be a reasonable definition of internal transfers.

The Court recognizes that the term "internal transfers" does not clearly include transfers to joint ventures. The statutory language refers to "internal transfers," although it could have easily referenced "transfers to related parties" if that was the intended result. Elsewhere in the statute Congress refers to "transfers to related parties," and Congress could easily have used the same language if it had intended to include transfers to

joint ventures.  Further, the SAA defines captive production as that done by the same producer.  Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, at 852 (1994).  Independent of Congress's use of the term "sold," the ITC would have reasonably defined internal transfers to include only transactions within the same producer, or the same corporation.  However, because all transfers of CRS must be either sales to the merchant market or internal transfers, and Congress clearly excluded related-party joint venture transfers from the "sales to the merchant market" category, the ITC's definition of internal transfers is unreasonable.

Therefore, transfers of CRS to related parties where title has not transferred are internal transfers.  The Court will remand the ITC's Final Determinations to re-examine the transfers to joint ventures.  The ITC is directed to define internal transfers in a manner consistent with the statutory language and this Opinion.  If the transfers are to related parties and title did not pass, or if compensation was not paid for the CRS, then the ITC's definition will have to categorize such a transaction as an internal transfer.

Plaintiffs make several other challenges to the ITC's interpretation of the captive production provision that will only be briefly addressed.  First, the Plaintiffs argue that the ITC

has previously found that transfers to joint ventures are internal transfers rather than sales, and that it has therefore unreasonably departed from its own precedent without explanation. Mem. Supp. Rule 56.2 Mot. of Bethlehem, Ispat, LTV, & U.S. Steel at 22-25.  Moreover, the Plaintiffs point out that in the present investigation the ITC's questionnaires defined "company transfers" as "[s]hipments made to related domestic firms," and defined "related firm" in turn as a "firm that your firm solely or jointly owned, managed, or otherwise controlled[.]"  Id. at 24.  Thus, because the ITC apparently treated transfers to joint ventures as internal transfers in the past and directed the Plaintiffs to do so in this review, its unexplained departure from that practice constitutes an abuse of discretion.

The ITC and Defendant-Intervenors argue that this is a novel issue, because the NSK case was decided before the captive production provision was even enacted.  Def. ITC's Opp'n at 19-21.  With regard to the substance of the Plaintiffs' argument, the ITC notes that even in 1993 it distinguished "internal transfers" from those to an "affiliated" company.  Id. at 20 n.82.

The Court has already determined that the ITC's definition of "internal transfers" is unreasonable, in light of Congress's intention regarding the definition of "sold."  Even so, the ITC

did not depart from its own precedent by defining internal transfers as transfers within the same producer.  As pointed out by the ITC, in the NSK case the ITC was defining "sale" under another statute.

Second, the Plaintiffs also contend that several of the transfers to joint ventures were actually tolling arrangements. Mem. Supp. Rule 56.2 Mot. of Bethlehem, Ispat, LTV, & U.S. Steel at 25.  The ITC counters that only a fraction of the transfers were made pursuant to tolling arrangements.  It is unnecessary for the Court to make a factual finding regarding the number of tolling arrangements.  The ITC has been instructed to reconsider whether any of the transfers were to related parties and whether title was transferred to the downstream processor.  In the case of tolling arrangements, where title does not transfer, the transaction is an internal transfer rather than a sale.  This analysis is subsumed within the Court's previous instructions to the ITC regarding the definition of "sold" and "internal transfer."

Third, the Plaintiffs argue that the SAA unambiguously requires that transfers to joint ventures be treated as internal transfers.  Id. at 31-32.  The relevant text in question provides: "Captive production refers to production of the domestic like product that is not sold in the merchant market and

that is processed into a higher-valued downstream article by the same producer.  Selling in the merchant market refers to sales of the domestic like product to unrelated customers."  URUGUAY ROUND AGREEMENTS ACT, STATEMENT OF ADMINISTRATIVE ACTION, H.R. DOC. No. 103-316, at 852 (1994).  The Plaintiffs zero in on the second half of this directive as "crystal-clear" proof that transfers to joint ventures must be internal transfers.  Mem. Supp. Rule 56.2 Mot. of Bethlehem, Ispat, LTV, & U.S. Steel at 31.

The ITC and Defendant-Intervenors argue that the domestic industry focuses on the second half of the language of the SAA, to the exclusion of the first half.  Def. ITC's Opp'n at 8. According to the ITC, if, as the Plaintiffs argue, it is absurd to label related-party joint ventures "unrelated customers," then it is equally ludicrous to call them the "same producer," given their different corporate existence, and, in many cases, joint ownership with a foreign steel producer.  Id. at 11-12.  The ITC determined that by using the term "the same producer," rather than terms such as "related parties" which appear elsewhere in the SAA, Congress deliberately opted to restrict the exception for captive production to internal transfers within the same corporate entity.  Id.  The ITC and Defendant-Intervenors argue that in light of this inherent contradiction in the language of

the SAA, the Court must defer to the ITC's reasonable interpretation.  Id. at 12.

The SAA is ambiguous, at best.  The SAA would exclude transfers to joint ventures from both captive production and sales in the merchant market.  This unintended result occurs despite the SAA's attempt to define captive production as everything that is not a sale in the merchant market.  The Court has already determined that Congress intended for transfers to related parties to be excluded from sales in the merchant market. Therefore, the Court will not rely on the ambiguous language of the SAA to define "sold" and "internal transfers."

Fourth, the Plaintiffs' final argument is that the ITC erred by making a completely unsupported factual finding that the joint ventures had the authority to purchase CRS from other sources and that the domestic producers may not have had distribution rights for all of the coated products for which they provided the substrate.  Mem. Supp. Rule 56.2 Mot. of Bethlehem, Ispat, LTV, & U.S. Steel at 34.  The Plaintiffs emphasize that the ITC's sole basis for this assertion was the joint brief of the respondents, the foreign steel companies.  Id. at 35.  They claim that with regard to the joint venture tolling arrangements, this assertion is demonstrably false, because tolling operations by definition cannot sell the steel they process.  Id.  They further claim with

respect to other joint ventures that the domestic producers'
Securities and Exchange Commission corporate disclosure filings
(10-K filings) show that at least three entities jointly owned
with foreign producers are required to obtain one hundred percent
of their substrate from the domestic joint venture partner; a
fourth joint venture must obtain seventy-five percent of its
substrate this way for the next decade; and that one of the
domestic producers is the sole selling agent for one of these
joint ventures.  Id. at 36.  The Plaintiffs also argue that
although some of the joint ventures are co-owned with foreign
steel producers, a fact much emphasized by the ITC, a number of
others are jointly owned among only domestic producers, who
supply one hundred percent of the CRS substrate to these
entities.  Id. at 37.

The ITC and Defendant-Intervenors observe that the majority
of the joint ventures are co-owned with foreign steel companies.
Def. ITC's Opp'n at 15.  In addition, they counter with their own
citations to 10-K filings tending to show that the domestic
industry does not account for all of the substrate requirements
of the joint ventures.  Id. at 14-15.

The ITC's determination is supported by substantial
evidence.  The Plaintiffs are simply emphasizing the converse of
the facts relied upon by the ITC in reaching its determination.

However, the Court doubts that this fact will be of much relevance in determining whether the transfers were sales or internal transfers under the Court's instructions to the ITC to redefine "internal transfers."

### 2.    Whether CRS Sold in the Merchant Market Is Used to Produce Downstream Articles

The ITC found that a significant portion of the merchant market purchases were devoted to producing the same downstream products as the majority of the captive production.  March Determination at 17-18.  The Plaintiffs argue that the ITC erred in reaching this conclusion because, in calculating the degree of overlap between captively-produced downstream products and downstream products produced from merchant market sales, it estimated the merchant market sales based on independent galvanizers' purchases from all sources, including imports.  Mem. Supp. Rule 56.2 Mot. of Bethlehem, Ispat, LTV, & U.S. Steel at 40.  The Plaintiffs argue that this was unreasonable given that the sales figure in the denominator was limited to sales of the domestic like product alone.  Id.

The Plaintiffs assert that this methodology directly violates the captive production statute, which states that "the production of the <u>domestic like product</u> sold in the merchant market is not generally used[.]"  Id. at 40-41; 19 U.S.C. §

1677(7)(C)(iv)(III) (emphasis added). The Plaintiffs also claim that this methodology is inconsistent with the ITC's past practice in cases such as Hot-Rolled Steel from Japan. Certain Hot-Rolled Steel Products from Japan, USITC Pub. 3202, Inv. No. 731-TA-807 (June 1999). The Plaintiffs further claim that correcting this error, and using instead their evidence of actual sales of the domestic like product in the merchant market, would result in a lower overlap ratio. Mem. Supp. Rule 56.2 Mot. of Bethlehem, Ispat, LTV, & U.S. Steel at 43.

The ITC and Defendant-Intervenors contest these points, arguing that the ITC's determination that the third prong of 19 U.S.C. § 1677(7)(C)(iv) was not satisfied is supported by substantial evidence. Def. ITC's Opp'n at 13-14. The ITC argues that it was entitled to use CRS purchased from all sources as the numerator, because there was no alternative data on the record for domestically produced CRS alone, and it was obliged to use the facts available. Id. at 18-19. The Plaintiffs' own figures proposed above are not acceptable as facts otherwise available because they encompass data only from the top producers. Id. at 19. The ITC also contests the accuracy of the Plaintiffs' proposed figures. Id. However, in reply, the Plaintiffs argue that the ITC did not follow the proper procedure for using facts

available.  Reply Br. Supp. Rule 56.2 Mot. of Bethlehem, Ispat, LTV, & U.S. Steel at 37-45.

In antidumping and countervailing duty proceedings, the ITC is required to use "facts otherwise available" if "necessary information is not available on the record[.]"  19 U.S.C. § 1677e(a)(1).  In addition, the statute requires the ITC to use facts otherwise available where an interested party or any other person: (1) withholds information that has been requested by the ITC; (2) fails to provide the requested information by the deadlines for submission of such information or in the form and manner requested, subject to subsections (c)(1) and (e) of section 1677m; (3) significantly impedes an antidumping or countervailing duty proceeding; or (4) provides information that cannot be verified as provided in section 1677m(i).  Id. § 1677e(a)(2)(A)-(D).  Section 1677e(a) cautions, however, that the use of facts otherwise available is subject to the limitations set forth in 19 U.S.C. § 1677m(d).

Section 1677m(d) governs "deficient submissions."  It directs the ITC that if it determines that a response to a request for information does not comply with the request, then the ITC must promptly inform the entity submitting the response of the nature of the deficiency and give that entity an opportunity to remedy or explain the deficiency in light of the

time limits established for the completion of the investigation. 19 U.S.C. § 1677m(d). Section 1677m(d) further provides that if the ITC finds the remedial response to be either "not satisfactory" or untimely, then it may, subject to section 1677m(e), disregard all or part of the original and subsequent responses. Id.

In its Final Determinations, the ITC did not once mention, let alone attempt to explain, its apparent decision to use facts otherwise available. Rather, in its brief, the ITC explains for the first time that it was entitled to use facts available because the "data [from the purchaser questionnaire responses was] not structured in such a way that it would be possible to completely segregate purchases of the domestic like product from purchases of subject imports." Def. ITC's Opp'n at 18. In a footnote, the ITC supports its decision to use facts otherwise available with a citation to 19 U.S.C. § 1677e(a). Id. at 19 n.74.

Although the ITC asserts in its brief that it was justified in using facts otherwise available, this assertion is clearly nothing more than a post hoc rationalization, given that the ITC never even mentioned the phrase "facts otherwise available" in its Final Determinations. This post hoc rationalization should be given no deference by the Court because an ITC decision must

be sustained, if at all, on the same basis as the reasoning articulated in the Final Determination itself.  NTN Bearing Corp. of Am. v. United States, 25 CIT __, 155 F. Supp. 2d 715, 736 (2001); see also Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69 (1962) (admonishing that "courts may not accept . . . counsel's post hoc rationalizations for agency action; [rather,] an agency's . . . order [may] be upheld, if at all, on the same basis articulated in the order by the agency itself").  Here, the ITC articulated no reasoning whatsoever in the Final Determinations regarding its decision to use facts otherwise available.  As a result, there is no reasoning on which to sustain the ITC's decision to use facts otherwise available, and the Court owes no deference to the ITC's determination.

Moreover, in conducting its analysis of the third prong of 19 U.S.C. § 1677(7)(C)(iv), the ITC was obligated to attempt to collect the comprehensive data it needed regarding domestically produced CRS before resorting to facts otherwise available.  Indeed, "[i]t is incumbent on the ITC to acquire all obtainable or accessible information from the affected industries on the economic factors necessary for its analysis."  Roquette Freres v. United States, 7 CIT 88, 94, 583 F. Supp. 599, 604 (1984).  In other words, the ITC "is obligated to make active, reasonable

efforts to obtain relevant data." Allegheny Ludlum Corp. v. United States, 287 F.3d 1365, 1373 (Fed. Cir. 2002).

Here, the ITC itself acknowledged in its preliminary determination that it did not possess sufficient information to analyze properly the third prong of 19 U.S.C. § 1677(7)(C)(iv). Specifically, the ITC stated as follows: "[W]e find that the record contains insufficient information to determine the applicability of factor . . . (III) of the captive production provision. . . . We will seek additional information, including data from purchasers, in any final phase of these investigations and will reexamine the applicability of the captive production provision at that time." Certain Cold-Rolled Steel Products From Argentina, Brazil, China, Indonesia, Japan, Russia, Slovakia, South Africa, Taiwan, Thailand, Turkey, and Venezuela, USITC Pub. 3214 at 23-24, Inv. Nos. 701-TA-393-396 and 731-TA-829-840 (July 1999). However, the ITC never sought any additional information from the Plaintiffs. This failure by the ITC to attempt to obtain relevant data prior to resorting to facts otherwise available renders its analysis of the third prong of 19 U.S.C. § 1677(7)(C)(iv) unsound.

Finally, 19 U.S.C. § 1677m(d) mandates that, before the ITC can resort to facts otherwise available, a party must be given prompt notice of any deficiency in the information it has

submitted to the ITC, and it must be given an opportunity to remedy that deficiency.  See <u>Mannesmannrohren-Werke AG v. United States</u>, 23 CIT 826, 837-38, 77 F. Supp. 2d 1302, 1312-14 (1999) (interpreting the requirements of 19 U.S.C. § 1677m(d)).  The Final Determinations do not indicate in any way that the ITC notified the Plaintiffs that the data they had provided was deficient.  Nor were the Plaintiffs given an opportunity to provide more comprehensive data regarding domestically produced CRS to the ITC.  Simply put, it was improper for the ITC to ignore the requirements of 19 U.S.C. § 1677m(d) before resorting to facts otherwise available.

For the foregoing reasons, the Court cannot conclude that the ITC's use of facts otherwise available was warranted under 19 U.S.C. § 1677e(a).  As a result, the Court remands the issue to the ITC to clarify how it complied with the statutory framework of both 19 U.S.C. § 1677e(a) and 19 U.S.C. § 1677m(d) for applying facts otherwise available.  If the ITC determines, on remand, that it did not adhere to all of the statutory prerequisite conditions, then the ITC must give the Plaintiffs an opportunity to remedy any deficiencies in their data.  See <u>NTN Bearing</u>, 25 CIT at __, 155 F. Supp. 2d at 737-38 (remanding the case to Commerce under 19 U.S.C. § 1677e(a) because of "considerable uncertainty" in Commerce's <u>Final Results</u>).

**B.    Whether Parties Had Opportunity to Comment**

The Plaintiffs' next major objection is procedural rather than substantive.  The Plaintiffs argue that the ITC acted unreasonably by not giving them notice and opportunity to comment on the perceived shift in methodology regarding treatment of transfers to joint ventures.  Mem. Supp. Rule 56.2 Mot. of Bethlehem, Ispat, LTV, & U.S. Steel at 44-48.  On February 18, 2000, the ITC released its Final Staff Report, in which, consistent with all prior phases of the investigation, transfers to related-party joint ventures were treated as internal transfers.  On February 25, 2000, the ITC made available to all parties all information on which they had not had an opportunity to comment, and permitted final comments to be submitted thereon by February 29, 2000.  This final release of information allegedly contained no indication that the ITC intended to treat the transfers in question any differently.  Id. at 46.  However, on March 20, 2000, the ITC released the March Determination, in which it recalculated merchant market sales data by determining that such transfers were not internal transfers, that the captive production provision therefore did not apply, and that all such transfers were to be treated as sales to the merchant market.  March Determination at 15-18.  The Plaintiffs claim that this action represented an avulsive change in the ITC's practice, and

that since the reports leading up to the Final Determinations contained no hint that such a change was contemplated, the Plaintiffs were effectively ambushed, as it would be unreasonable to expect them to devote any portion of the fifteen pages allowed for their final comments to addressing what they believed to be a settled issue. Id. at 47. They claim that this action contravenes the principles underlying the antidumping statutes, which require the ITC to provide the parties with the "essential facts" under consideration. Id. at 44-46.

The ITC, in the few short paragraphs it devotes to the issue, claims that the data upon which it relied in reaching its determination was entirely public and available for review and comment by the Plaintiffs. Def. ITC's Opp'n at 25-26. The ITC further argues that nothing in United States or international law obliges it to divulge in advance the weight that it intends to give each specific piece of evidence; otherwise, it would have to release a draft of its final determination for comment even before the Commissioners had voted on it. Id. at 26. Finally, the ITC observes that in Allegheny Ludlum Corp. v. United States, 24 CIT 858, 116 F. Supp. 2d 1276 (2000), the Court of International Trade found that the plaintiffs were not prejudiced by last-minute revisions to the final staff report made just

before the Commissioners voted, since the staff report is only one of the documents comprising the record.  Id. at 24-25.

In light of the Court's decision to remand this case to the ITC for it to reconsider its definition of "internal transfers," it is unnecessary for the Court to rule on the Plaintiffs' claim that they did not have an opportunity to comment on the ITC's perceived shift in methodology regarding the treatment of transfers to joint ventures.

**C.    The ITC's Findings Concerning Certain Conditions of Competition, and the Volume and Price Effects of CRS Imports**

In determining whether a domestic industry has suffered "material injury," the ITC is directed by statute to consider (1) the volume of imports of the subject merchandise; (2) the effect of imports of that merchandise on prices in the United States for domestic like products; and (3) the impact of imports of subject merchandise on domestic producers of domestic like products.  See 19 U.S.C. § 1677 (1994).  The ITC determined with respect to each of these considerations that the domestic industry had not suffered material injury.  March Determination at 15.  Before this Court, the Plaintiffs challenge each of these determinations.  See Mem. Supp. Mot. J. Agency R. Under Rule 56.2 of Bethlehem, LTV, National Steel, & U.S. Steel at 10-45.

The analysis of the conditions of competition, the effect of imports on prices of domestic like products, and the impact of imports on domestic producers of domestic like products, are the very economic factors and market share considerations that the captive consumption provision contemplates.  The ITC is directed to reconsider whether the captive consumption provision applies; if it does apply, then the ITC will have to consider primarily the merchant market in its analysis of economic factors and market share.  Therefore, the Court will not opine at this time whether the ITC's factual determinations are supported by substantial evidence.[2]

## IV. CONCLUSION

For the reasons outlined above, the Court finds that the ITC's interpretation of 19 U.S.C. § 1677(7)(C)(iv)(III) is not in accordance with law.  Accordingly, the Final Determinations are remanded to the ITC to define "internal transfers" consistent with the will of Congress.  Additionally, the Court finds that the ITC did not observe the proper procedure for applying facts otherwise available in its calculation of the overlap between

---

[2]   The ITC's brief points out that the Plaintiffs rely heavily on only merchant market data, while the ITC was not restricted to the merchant market because it had determined that the captive production provision did not apply.  Def. ITC's Opp'n at 27, 32. It is necessary that the ITC re-evaluate whether the captive production provision applies before the Court can determine if the ITC's determination was supported by substantial evidence.

captively-produced downstream products and downstream products produced from merchant market sales.  The Court remands the Final Determinations and instructs the ITC to clarify how it complied with the statutory framework of both 19 U.S.C. § 1677e(a) and 19 U.S.C. § 1677m(d) for applying facts otherwise available.  If the ITC determines that it did not adhere to all of the statutory prerequisite conditions, then it must give the Plaintiffs an opportunity to remedy any deficiencies in their data.  In addition, in light of the Court's instruction to the ITC to reconsider its definition of "internal transfers," the Court declines to rule on whether the Plaintiffs had an opportunity to comment on the perceived shift in methodology by the ITC.  Finally, the Court will not rule on the sufficiency of the evidence prior to the ITC's re-weighing of the evidence under the Court's remand instructions.

The ITC is instructed to issue its findings on remand within 90 days of the date of the Order accompanying this Opinion.

**SO ORDERED.**

_____
**Richard W. Goldberg**
**Senior Judge**

**Date:      October 28, 2003**
**           New York, New York**

**ERRATUM**

Bethlehem Steel Corporation, et al. v. United States, Cons. Court No. 00-00151, Slip Op. 03-143, issued October 28, 2003.

- On page 2, the identification of Plaintiffs' counsel should read: "Skadden, Arps, Slate, Meagher & Flom LLP (Robert E. Lighthizer, John J. Mangan, Stephen P. Vaughn, and Holly A. Gimbel) for Plaintiffs Bethlehem Steel Corporation, LTV Steel Company Inc., National Steel Corporation, and U.S. Steel Group, a unit of USX Corporation."