**Slip Op. 04-147**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: HONORABLE RICHARD W. GOLDBERG, SENIOR JUDGE**

|  |  |
|---|---|
| UNITED STATES STEEL CORPORATION and ISPAT INLAND INC., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> USINAS SIDERURGICAS DE MINAS GERAIS S/A, COMPANHIA SIDERURGICA PAULISTA, COMPANHIA SIDERURGICA NACIONAL, THAI COLD ROLLED STEEL SHEET PUBLIC COMPANY LIMITED, ISCOR, LTD., NIPPON STEEL CORPORATION, JFE STEEL CORPORATION, SUMITOMO METAL INDUSTRIES, LTD., KOBE STEEL, LTD., NISSHIN STEEL COMPANY, LTD., EREGLI DEMIR VE CELIK FAB. T.A.S., and SHANGHAI BAOSTEEL GROUP CORPORATION, <br><br> Defendant-Intervenors. | Cons. Ct. No. 00-00151 |

[ITC's negative injury remand determination sustained.]

Date: November 18, 2004

Skadden, Arps, Slate, Meagher & Flom LLP (John J. Mangan) for plaintiffs United States Steel Corporation and Ispat Inland Inc.

James M. Lyons, Acting General Counsel, Marc A. Bernstein, Acting Asst. General Counsel for Litigation, U.S. International Trade Commission (Michael Diehl), for defendant United States.

Willkie Farr & Gallagher LLP (William H. Barringer, James P. Durling, Kenneth J. Pierce, Matthew R. Nicely, Christopher A. Dunn, and Robert E. DeFrancesco) for defendant-intervenors Usinas Siderurgicas de Minas Gerais S/A, Companhia Siderurgica Paulista, Companhia Siderurgica Nacional, Thai Cold Rolled Steel Sheet Public Company Limited, Nippon Steel Corporation, JFE Steel Corporation, Sumitomo Metal Industries, Ltd., Kobe Steel, Ltd., and Nisshin Steel Company, Ltd.

Wilmer Cutler Pickering LLP (Kristin H. Mowry) for defendant-intervenor Iscor, Ltd.

Law Offices of David L. Simon (David L. Simon) for defendant-intervenor Eregli Demir ve Celik Fab. T.A.S.

Greenberg Traurig, LLP (Philippe M. Bruno) for defendant-intervenor Shanghai Baosteel Group Corporation.

#### OPINION

**GOLDBERG, Senior Judge:**  This case is before the Court following remand to the United States International Trade Commission ("ITC").  In Bethlehem Steel Corp. v. United States, 27 CIT __, 294 F. Supp. 2d 1359 (2003) ("Bethlehem I"), familiarity with which is presumed, the Court remanded the ITC's determinations with respect to plaintiffs Bethlehem Steel Corporation, Ispat Inland Inc., LTV Steel Company, Inc., United States Steel Corporation, and National Steel Corporation[1] in Certain Cold-Rolled Steel Products From Argentina, Brazil, Japan, Russia,

---

[1] Plaintiffs Bethlehem Steel Corporation and National Steel Corporation were voluntarily dismissed from this action in an order entered by the Court on July 7, 2004.  Plaintiff LTV Steel Company, Inc. was voluntarily dismissed from this action in an order entered by the Court on November 18, 2004.

South Africa, and Thailand, 65 Fed. Reg. 15008 (Mar. 20, 2000),

Certain Cold-Rolled Steel Products From Turkey and Venezuela, 65

Fed. Reg. 31348 (May 17, 2000), and Certain Cold-Rolled Steel

Products From China, Indonesia, Slovakia, and Taiwan, 65 Fed.

Reg. 44076 (July 17, 2000) (collectively "Final Determinations").

In Bethlehem I, the Court found that the ITC's

interpretation of the captive production provision, see 19 U.S.C.

§ 1677(7)(C)(iv), was not in accordance with law.  Specifically,

the Court determined that the ITC's definition of "internal

transfers" was unreasonable.  Accordingly, the Court remanded the

Final Determinations to the ITC to define "internal transfers"

consistent with the will of Congress.  The Court also instructed

the ITC that, if it found the captive production provision to be

applicable on remand, it would be required to consider primarily

the merchant market in its "material injury" analysis under 19

U.S.C. §§ 1677d(b) and 1673d(b).[2]

The ITC duly complied with the Court's order.  After

allowing the domestic producers and purchasers to provide

additional data relating to the captive production provision, the

---

[2] The Court also instructed the ITC to clarify on remand how it complied with the statutory framework of both 19 U.S.C. § 1677e(a) and 19 U.S.C. § 1677m(d) for applying facts otherwise available.  This issue is not presently before the Court since the ITC afforded the domestic producers and purchasers an opportunity to provide additional data during the remand investigations, and the parties no longer dispute whether the ITC complied with the statutory framework for applying facts otherwise available.

ITC issued the Views of the Commission on Remand (Apr. 30, 2004) ("Remand Results"). In the Remand Results, the ITC determined that the captive production provision was applicable, but further found that the domestic industry was not materially injured, or threatened with material injury, by reason of imports of certain cold-rolled steel products that the United States Department of Commerce found to be subsidized and/or sold at less than fair value in the United States.

United States Steel Corporation ("U.S. Steel") submitted Comments on the U.S. International Trade Commission's Redetermination Pursuant to Court Remand ("Pl.'s Comments"), and the ITC submitted Reply Comments in Defense of its Remand Determination ("ITC's Reply"). Defendant-Intervenors also submitted a Response to Plaintiffs' Comments ("Def.-Intvrs.' Response").[3]

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c). After due consideration of the parties' submissions, the administrative record, and all other papers had herein, and for the reasons that follow, the Court sustains the Remand Results.

---

[3] The response was submitted on behalf of Nippon Steel Corporation, JFE Steel Corporation, Sumitomo Metal Industries, Ltd., Kobe Steel, Ltd., Nisshin Steel Co., Ltd., and Thai Cold Rolled Steel Sheet Public Co., Ltd.

## I. <u>STANDARD OF REVIEW</u>

The Court must sustain the <u>Remand Results</u> unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988) (citation omitted). Moreover, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." <u>Matsushita Elec. Indus. Co. Ltd. v. United States</u>, 750 F.2d 927, 933 (Fed. Cir. 1984) (citation omitted).

The reviewing court may not, "even as to matters not requiring expertise . . . displace the [agency's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it <u>de novo</u>." <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951). In this regard, "the court may not reweigh the evidence or substitute its judgment for that of the ITC." <u>Dastech Int'l, Inc. v. USITC</u>, 21 CIT 469, 470, 963 F. Supp. 1220, 1222 (1997).

## II. <u>DISCUSSION</u>

**A.    The ITC Reasonably Concluded that the Subsidized and/or LTFV Imports Did Not Affect Domestic Prices.**

All parties agree that "[t]he central issue in these investigations is the role, if any, of subject imports in the price declines in the domestic market."  <u>Remand Results</u> at 17; Pl.'s Comments at 4; Def.-Intvrs.' Response at 2.  In evaluating the price effects of the subject imports, the ITC examines whether:

> (I)    there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and
> (II)   the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii).

### 1.    *Evidence of Underselling Is Not a <u>Per Se</u> Indication of Injury.*

U.S. Steel points to the pricing data for three specific items collected by the ITC, which "leaves no doubt that subject imports almost always undersold the domestic like product[.]" Pl.'s Comments at 4-5.  From 1996 to 1997, the ITC made 268 comparisons and found 211 instances of underselling.  <u>Id.</u> at 5. Similarly, from 1998 to the third quarter of 1999, the ITC made 319 comparisons and found 287 instances of underselling.  <u>Id.</u> According to U.S. Steel, "[t]hese data – which must be considered by law – <u>compel</u> the conclusion that subject imports had a

significant depressing effect on domestic prices."  <u>Id.</u> (emphasis added).

To the extent U.S. Steel contends that evidence of underselling is a <u>per se</u> indication of injury, its argument fails.  <u>Coalition for the Pres. of Am. Brake Drum & Rotor Aftermarket Manufacturers v. United States</u>, 22 CIT 520, 526, 15 F. Supp. 2d 918, 924 (1998).  "Evidence of underselling alone is legally insufficient to support an affirmative injury determination."  <u>BIC Corp. v. United States</u>, 21 CIT 448, 458, 964 F. Supp. 391, 401 (1997), <u>aff'd</u>, App. No. 97-1443 (Fed. Cir. 1998).  "Rather, the [ITC] has a statutory mandate to consider not only whether the subject imports have significantly undersold the domestic like product, but also how the subject imports effect [sic] the prices of the domestic like product."  <u>Id.</u>

The ITC has considerable discretion in interpreting the evidence and determining the overall significance of any particular factor in its analysis.  <u>Coalition</u>, 22 CIT at 527, 15 F. Supp. 2d at 925.  "The significance of the various factors affecting an industry will depend upon the facts of each particular case.  Neither the presence nor the absence of any factor listed in the bill can necessarily give decisive guidance with respect to whether an industry is materially injured, and the significance to be assigned to a particular factor is for the ITC to decide."  S. Rep. No. 249 at 88 (1979), <u>reprinted in</u> 12979

U.S.C.C.A.N. 381, 474.

Here, the ITC did not neglect the evidence of underselling, but found that competition between subject imports and the domestic like product was "attenuated by differences between the two in various non-price factors[.]" Remand Results at 16-17 ("While underselling has existed throughout the period, we find that the persistent price gap between subject imports and domestic prices is largely due to various differences between the domestic and imported products . . . .").

**2.   *The ITC's Finding that Underselling Did Not Have a Significant Effect on Domestic Price Levels Is Supported by Substantial Evidence and Otherwise in Accordance with Law.***

First, the ITC found that "[a]ccording to purchasers, quality, availability, and delivery are the most important non-price factors when choosing a supplier . . . ." Remand Results at 17-18. U.S. Steel argues that the ITC never found a significant difference in quality between the domestic product and the subject imports. Pl.'s Comments at 6. This argument is irrelevant, as the ITC explicitly noted that "purchasers overwhelmingly listed quality as the most important factor in purchasing decisions." Remand Results at 18 n.72. Moreover, price was listed as the most important factor by only three of the thirty purchasers. Id.

Second, the ITC found that "when purchasers find a reliable supplier, they rarely change." Id. at 18. On a related note,

the ITC found that "[t]he stablility of supplier-purchaser relationships . . ., even in the face of price fluctuations, can be seen in the prevalence of the honoring of contracts . . . ." Id. U.S. Steel contends that, in fact, supplier-purchaser relationships were not stable. Pl.'s Comments at 7. U.S. Steel points out that the domestic industry lost significant sales to subject imports, and furthermore that U.S. producers were forced to renegotiate nearly one-fifth of their contract sales. Pl.'s Comments at 7-8. U.S. Steel's argument ignores the fact that the domestic industry consciously decided to captively consume more cold-rolled steel to produce more lucrative downstream products, like galvanized steel. Joint Respondents' Pre-hearing Brief at 57-58, P.R. 420. Regarding the stability of contracts, the ITC found that more than four-fifths of domestic producers' contract sales were honored, despite severe price declines in the cold-rolled steel market. Remand Results at 18.

Third, the ITC found that "subject import prices have generally continued to decline in 1999, while domestic prices have recovered in certain important segments." Id. at 19. U.S. Steel counters that there was no "recovery" in domestic prices and cites to evidence showing that "while domestic prices . . . improved slightly from Q2 1999 to Q3 1999, those prices remained well below prices for Q3 1998." Pl.'s Comments at 8. What is clear, however, is that domestic prices actually increased during

the period when underselling was at its greatest.  See Def.-
Intvrs.' Response at 10.

Fourth, the ITC found that "purchasers generally regard
domestic producers as being the price leaders in the market . . .
."  Remand Results at 19.  U.S. Steel argues that, because only
16 of 41 purchasers reported being able to identify a price
leader, it is plainly not correct that purchasers "generally"
regard domestic producers as the price leader.  Pl.'s Comments at
9.  The Court finds as the ITC pointed out, that no purchaser
mentioned any subject importer or subject producer as a price
leader.  Remand Results at 19.

Accordingly, the Court holds that the ITC's finding that
underselling did not have a significant effect on domestic price
levels is supported by substantial evidence and otherwise in
accordance with law.

**B.    The ITC's Finding that the Persistent Price Gap Between
       Subject Imports and the Domestic Like Product Was Due to
       Factors Other than Underselling Is Supported by Substantial
       Evidence and Otherwise in Accordance with Law.**

The ITC found that the decline in domestic prices was a
result of other competitive conditions, specifically: (1) growing
competition within the domestic industry; (2) the decline in hot-
rolled steel prices; and (3) a strike at General Motors
Corporation ("GM").

First, the ITC determined that "the large and growing number
of domestic participants in [the cold-rolled steel] market has

increased competition within the domestic industry . . . ."
<u>Remand Results</u> at 20.  U.S. Steel contends that the increase in
domestic producers was minimal.  Pl.'s Comments at 10-11.  The
ITC based its finding on "the competitive advantages accruing to
minimills and the decline in scrap prices during the period under
investigation."  <u>Remand Results</u> at 20.  The Court finds that the
ITC reasonably determined that cold-rolled steel produced by
minimills exerted downward pressure on domestic prices, despite
their small number and size, because of their different
production inputs.[4]  <u>See</u> <u>id.</u>  None of the other arguments
presented by U.S. Steel undercuts the substantial evidence
supporting the ITC's finding.

Second, the ITC found that a "decline in hot-rolled prices
likely put downward pressure on the domestic industry's cold-
rolled prices.  This downward pressure is likely [in part]
because of the historic relationship between hot-rolled costs and
prices and cold-rolled prices . . . ."  <u>Id.</u>  The ITC further
noted that "[f]alling hot-rolled prices have been particularly
beneficial to re-rollers, who purchase, rather than produce, hot-
rolled steel for cold-rolling."  <u>Id.</u>  U.S. Steel argues that

---

[4] Minimills use scrap, as opposed to slab, as the primary
input for hot-rolled steel.  Def.-Intvrs.' Response at 12.  Hot-
rolled steel, in turn, is the primary input for cold-rolled
steel.  <u>Id.</u>  Thus, the decline in scrap prices noted by the ITC
enabled minimills to reduce their prices for cold-rolled steel.
<u>Id.</u>

there is "no evidence that hot-rolled prices <u>caused</u> the decline

in cold-rolled prices."  Pl.'s Comments at 13.  Furthermore, U.S.

Steel disputes the notion that re-rollers, rather than imports,

drove down domestic prices, pointing out that re-rollers only

accounted for a very small percentage of domestic production in

1998, and that imports frequently undersold re-roller shipments

in 1998 and interim 1999.  <u>Id.</u> at 12.  To support its finding,

the ITC cited the testimony of Jim Bouchard, a witness for U.S.

Steel, who stated:

> If you look at hot roll versus cold roll, specifically,
> if you question over the past 20 years the relation
> between pricing has rotated between $95 a ton from hot
> roll, cold roll being $95 to about $110 a ton.  The
> relationship has stayed intact the past 20 years and
> right now is running between $100 to $110.

<u>Remand Results</u> at 21 n.89.  The Court finds that this historical

relationship has not been rebutted by evidence in the record.

Nor can it be established that this historical relationship is

not present in this case.  Moreover, the ITC reasonably

determined that cold-rolled steel produced by re-rollers exerted

downward pressure on domestic prices, despite the low percentage

of total production that they constitute.  <u>Id.</u> at 20.

Third, the ITC identified a strike at GM lasting from June 5

to July 30, 1998, as yet another factor contributing to the

decline in domestic prices.  <u>Id.</u> at 21.  Approximately 80 percent

of overall GM purchases of flat-rolled steel products are of

cold-rolled and corrosion-resistant steel.  <u>Id.</u>  As a result of

the strike, GM estimated that 685,000 tons of flat-rolled steel products (550,000 tons of which were cold-rolled steel) were not purchased by GM or its suppliers.  Id.  U.S. Steel contends that subject imports had a greater impact on cold-rolled domestic prices than the GM strike.  Pl.'s Comments at 14.  It is undisputed, however, that the fall in domestic shipments as a result of the GM strike was greater than the rise in subject imports in 1998.  See id. at 14-15; Def.-Intvrs.' Response at 17-18.  Furthermore, the ITC noted that the majority of domestic producers and importers reported that the strike "had a significant effect on the market in 1998, temporarily reducing demand and causing an oversupply of cold-rolled steel products." Remand Results at 21.

Accordingly, the Court holds that the ITC's finding that the price gap between domestic cold-rolled steel and subject imports was due to growing competition within the domestic industry, a decline in hot-rolled steel prices, and a strike at GM is supported by substantial evidence and otherwise in accordance with law.

### III. <u>CONCLUSION</u>

For the foregoing reasons, the Court sustains the ITC's

<u>Remand Results</u>.   Judgment will be entered accordingly.


<u>/s/ Richard W. Goldberg</u>
**Richard W. Goldberg**
**Senior Judge**


**Date:      November 18, 2004**
            **New York, New York**